[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14005
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 6, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-01616-CV-IPJ

JUDY BRANNON,

Plaintiff-Appellant,

versus

BELLSOUTH TELECOMMUNICATIONS,
INC.,

Defendant,

BELLSOUTH SHORT TERM
DISABILITY PLAN,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 6, 2009)

Before BIRCH, CARNES and HULL, Circuit Judges.

PER CURIAM:

Judy Brannon appeals the district court's entry of summary judgment in favor of BellSouth Short Term Disability Plan (STD Plan) in her action for wrongful denial of benefits under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. She contends that the district court erred by determining, on <u>de novo</u> review, that the claims administrator for the BellSouth STD Plan was "not wrong" in denying her six months of short-term disability benefits.[1]

**I.**

Judy Brannon worked at a BellSouth Telecommunications customer call center for over twenty-six years. On August 12, 2005, Brannon, who was in treatment for depression and anxiety, was hospitalized for seven days after a conflict with her supervisor made her condition worse. She did not return to work.

---

[1] Because we agree with the district court that the claims administrator was "not wrong" in denying Brannon six months of short-term benefits, we do not reach two other arguments Brannon raises. First, she asserts that she was entitled to long-term disability benefits. We do not address that argument because a Plan participant is eligible for long-term disability benefits only where the participant was awarded and paid for the full amount of short-term disability benefits. Second, she asserts that the district court erred by dismissing BellSouth Telecommunications, Inc. as a party. Although she asserts that the dismissal "inhibited [her] . . . discovery efforts," she acknowledges that the dismissal is "harmless error if Brannon was not disabled under the terms of the plan."

Brannon applied for benefits under the BellSouth STD Plan, which offers short-term benefits for up to fifty-two weeks to an employee of her tenure and position who is "disabled" under the Plan. Her application was considered by Broadspire Services, Inc.,[2] a third party vendor given "complete discretionary authority" to administer claims under the terms of the STD Plan. Broadspire approved benefits for the first six months following Brannon's hospitalization, but discontinued benefits as of February 20, 2006 after determining that the medical evidence no longer supported a finding that she was "disabled." There is no dispute that Brannon was entitled to benefits for the first six months. Only the denial of benefits for the second six months is at issue in this appeal. The district court found that the denial was "not wrong." We agree.

We review de novo a district court's grant of summary judgment and "apply the same legal standards that governed the district court's decision." Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1358 (11th Cir. 2008). ERISA itself does not set out the appropriate standard for a court to apply in reviewing a claims administrator's benefits decision. Id. at 1355. We have held, however, that "[o]ur review of a denial of benefits is for whether the decision of

---

[2] Broadspire Services, Inc. was formerly Kemper, and is now Aetna. The personnel and procedures have remained the same.

the administrator was arbitrary and capricious." Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008). To make that determination, we apply a six-step analysis. See id. Our analysis in the present case begins and ends with the first step, which instructs us to:

> Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

Doyle, 542 F.3d at 1346–57 (citations omitted).[3]

## II.

Brannon contends that the record establishes that she had a "disability" under the STD Plan from February 20, 2006 forward and is thus entitled to short-term disability benefits from that date through the remainder of the fifty-two week period. She can prevail only if we find that Broadspire's decision was "wrong." See Williams, 373 F.3d at 1138. "A decision is 'wrong' if, after a review of the decision of the administrator from a de novo perspective, the court disagrees with the administrator's decision." Glazer, 524 F.3d at 1246 (citation and internal quotation marks omitted).

---

[3] We have recently modified the sixth step in light of the Supreme Court's decision in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. ___, 128 S. Ct. 2342 (2008). See Doyle, 542 F.3d at 1360. That modification, however, does not affect our analysis here.

4

In our de novo review, we turn first to the plan itself. See 29 U.S.C. § 1104(a)(1)(D) (providing that an ERISA plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." Under the STD Plan:

> Disability means as of the eighth consecutive calendar Day of Absence a medical condition supported by objective medical evidence, which (i) makes a Participant unable to perform any type of work as a result of physical or mental illness or an accidental injury . . . . . "Any type of work" includes the following regardless of availability: (a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties. "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions.[4]

Thus, under the terms of the Plan, Brannon had to provide objective medical evidence showing that she was unable to perform any type of work as a result of her medical condition.

To evaluate Broadspire's application of that definition to Brannon's claim,

---

[4] The district court applied this definition, which appears in the STD Plan as amended and restated on January 1, 2006, and we will too. In her reply brief, Brannon suggests that an earlier version of the STD Plan applies—a version in which the "supported by objective medical evidence" language does not appear. That suggestion is of little moment, though, because Brannon admits that objective medical evidence is generally necessary under ERISA and that it is valid criteria on which to decide claims. Broadspire properly evaluated the adequacy of objective medical evidence regardless of whether the "supported by objective medical evidence" language was included in the definition of disability.

5

we are limited to the record that was before Broadspire when it made its decision. See Glazer, 524 F.3d at 1247 (citation omitted). Brannon bears the burden of proving that she was disabled under the terms of the Plan. See Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir.1998).

Brannon submitted enough medical evidence to establish a disability before February 20, 2006. Neither party disputes that. After February 20, 2006, however, Broadspire received only one letter on Brannon's behalf—a letter from Brannon's treating licensed professional counselor, Kathy Sechriest.[5] Although the letter, dated June 26, 2006, states that "[Brannon's] symptoms have not improved in the last year and preclude her from working at any job," it fails to provide support for that conclusion. The letter summarizes Brannon's treatment history including the details surrounding Sechriest's recommendation that she be hospitalized. It also summarizes the symptoms and conduct detailed in Sechriest's pre-February 20, 2006 submissions. Aside from Sechriest's own observations,

---

[5] Brannon points out two other pieces of evidence in her file. First, there was a letter from Broadspire stating that Brannon had applied for and received a leave of absence from her position effective February 20, 2006 under the STD Plan. That letter was not based on any determination of disability. Instead, the leave was approved for the period of time in which she appealed Broadspire's decision, and if she was later found to be disabled, the time would be deemed a "service credit." Second, there was a March 20, 2006 letter awarding her Social Security disability benefits beginning February 2006. However, the "approval of 'disability benefits' by the SSA is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1314 n.8 (11th Cir. 1999).

however, there is little objective evidence supporting the conclusion that Brannon could not work at any job.

There is also little or no explanation for why Brannon's symptoms make her unable to perform any job, a requirement of "disability" under the Plan. Instead, the letter focuses on why Brannon would be unable to perform her old job.

> She admits to suicidal ideations and feels strongly that if she were forced to go back to work she wouldn't be able to control her urges to hurt her supervisor. The harassment [Brannon] has described to me does indeed sound like the supervisor singled [Brannon] out to criticize her in front of others. The supervisor has reportedly ignored the same behaviors in other workers.

Sechriest's letter introduces no new evidence or treatment records. Brannon cannot meet her burden with that letter alone. The generalized statement that her "symptoms have not improved in the last year" is not specific enough to bootstrap in all of the evidence from before February 20, 2006. Other evidence in the record supports Broadspire's decision and contradicts Sechriest's conclusion that Brannon could not perform any job. That evidence includes an independent medical examination of Brannon and three peer reviews of the medical evidence conducted by non-examining physicians.

Before terminating Brannon's benefits, Broadspire scheduled her for an independent medical examination (IME) with Dr. Thomas Boll. Dr. Boll

7

administered an intelligence test using the Wechsler Adult Intelligence Scale-III. From the results, he determined that Brannon was a "woman with lifelong abilities in the low average range; that she had no suggestion of significant loss or deterioration or impairment or areas of dysfunction of a specific and identifiable nature." He also administered two malingering tests. One test showed that she was not malingering and the other test result was "borderline." After speaking with Brannon, Dr. Boll noted that she reported having lived with depression for most of her life, but had nonetheless been able to maintain her job for twenty-six years.

Dr. Boll also reported that Brannon:

> did not demonstrate any emotional dyscontrol. She demonstrated good ability to show appropriate affect and her affect was appropriate to the content of the conversation discussed. There were no dramatic shifts or any evidence of emotional liability. Ms. Brannon did not demonstrate any cognitive impairment with attention, concentration or memory despite complaints to the contrary. . . . She did not demonstrate any impairment in reality testing and specifically denied delusions and hallucinations. She did not demonstrate any clinically significant behavioral symptoms.

Also before terminating Brannon's benefits Broadspire referred her file to Dr. Leonard Schnur for a peer review. Dr. Schnur stated that there were no recent examination findings by either of Brannon's healthcare providers and that all of their documentation pre-dated February 20, 2006. He noted that additional

8

documentation from Brannon's treating providers would be helpful in assessing Brannon's claim. Dr. Schnur concluded that the IME showed no evidence of impairment, and there was a lack of examination findings to substantiate functional impairment after February 20, 2006. He stated that the "claimant's subjective complaints of emotional distress were not substantiated through examination findings." The next day Broadspire informed Brannon that her benefits were retroactively denied starting on February 20, 2006.

In that denial letter Broadspire reiterated that "the medicals no longer supported [her] inability to perform any work," and cited to section 2 of the Plan requiring "objective data that supports your inability to work any job within the company." The letter explained that the IME did not provide clinical evidence showing an impairment or illness so severe that Brannon was unable to work. The letter informed Brannon of her right to submit additional medical information for review. It listed examples of objective information that Brannon could submit including a Global Assessment of Functioning, a full mental status exam, observable objective findings, psychological testing, and progress notes.

Brannon appealed the decision under the plan's two level appeal procedure. During the course of review, Broadspire referred Brannon's file to two peer reviewing physicians. The first post-denial peer review was conducted by Dr.

Lawrence Burstein, a psychologist. Dr. Burstein reviewed the file, specifically considering the IME and the most recent statements submitted by Brannon's treating providers, and he found that the medical evidence failed to provide supporting examination findings or examples showing that Brannon was unable to work at any job. Dr. Burstein concluded that the information in Brannon's file did not support a functional impairment that, from a psychological perspective, would have precluded Brannon from all occupations.

The second post-denial peer review was conducted by Dr. Bunny Falk. Dr. Falk also considered the IME and observed that most of the documentation pre-dated February 20, 2006. Dr. Falk was the only physician to conduct a peer review after Sechriest submitted the June 26, 2006 letter. Dr. Falk found that although Sechriest had reported her own actual observations, she failed to include examples of how the symptoms she observed would prevent Brannon from working. She determined that the available documentation did not support a finding of functional impairment that, from a psychological perspective, would preclude working. Broadspire denied Brannon's second and final appeal on August 22, 2006. The letter stated that the additional information Brannon submitted did not support the inability to perform any or all types of work, particularly sedentary work.

Brannon asks us to discount Dr. Boll's IME report because as a referral physician for Broadspire, he had an incentive to find that she was not disabled unlike her treating providers.  Furthermore, she points out that Dr. Boll met with Brannon only once, and Dr. Boll did not have a level of expertise exceeding that of her treating providers.  For this argument, she relies on Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965 (2003).

Nord does not support Brannon's argument.  Under Nord "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Id. at 834, 123 S. Ct. at 1972.  The Court explained that a plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," id., 123 S. Ct. at 1972, but that is not what happened here.  Dr. Boll's report offers the most detail about any post-February 20, 2006 evaluation of Brannon's condition. Broadspire's decision to credit that reliable evidence does not constitute an arbitrary refusal to consider Sechriest's June 26, 2006 letter, which failed to explain why she could not perform "any job."

Brannon also asks us to discount the peer reviews of Drs. Schnur, Burstein,

11

and Falk as "flawed" under Oliver v. Coca Cola Company, 497 F.3d 1181 (11th Cir. 2007), vacated in part, 506 F.3d 1316 (11th Cir. 2007), and adhered to in part on rehearing, 546 F.3d 1353 (11th Cir. 2008).  In Oliver we held that the plan administrator had arbitrarily refused to consider reliable evidence that supported Oliver's claim for benefits under his ERISA plan.  See id. at 1199.  We explained:

> Here, Oliver presented Broadspire and Coca-Cola with a plethora of medical evidence in support of his disability claim. Coca-Cola denied Oliver's claim not on the basis of conflicting, reliable evidence—a practice we have upheld— rather, it simply ignored relevant medical evidence in order to arrive at the conclusion it desired.

Id.  (citation omitted).

Unlike Oliver, Brannon did not present Broadspire with "a plethora of medical evidence" supporting her post-February 20, 2006 disability claim.  More than once after that date, Broadspire asked for a Global Assessment of Functioning, a full mental status examination, observable objective findings, psychological testing, and progress notes.  Brannon did not submit any such evidence after February 20, 2006.  Instead, after that date Dr. Boll conducted his independent medical examination and concluded that Brannon "did not demonstrate any clinically significant behavioral symptoms."  Aside from Sechriest's June 26, 2006 update letter, Brannon presented no medical evidence to support her claim of disability for the relevant time period.

12

Brannon did not provide enough evidence to establish that she continued to fit the disability requirements under the Plan after February 20, 2006. The evidence she submitted during that time failed to explain how her medical condition prevented her from performing "any type of work." Sechriest's letter merely concludes that Brannon's "symptoms have not improved in the last year and [that they] preclude her from working any job." Weighed against Dr. Boll's independent medical examinations and the peer reviews, Broadspire's decision to terminate Brannon's benefits as of February 20, 2006 was "not wrong." See Glazer, 524 F.3d at 1247.

**AFFIRMED.**