**Ramses VIVAS, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**Case No. 10–22992–CIV.**

United States District Court, S.D. Florida, Miami Division.

Signed Sept. 22, 2014.

Filed Sept. 23, 2014.

Juan Pablo Gonzalez–Sirgo, J.P. Gonzalez–Sirgo, P.A., Coral Gables, FL, for Plaintiff.

Jerel Charles Dawson, William Joseph Gallwey, III, Shutts & Bowen, Miami, FL, for Defendant.

## *ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

JOSE E. MARTINEZ, District Judge.

THIS CAUSE came before the Court upon Plaintiff's Motion for Summary Judgment (D.E. No. 85) and Defendant's Motion for Summary Judgment (D.E. No. 77). Plaintiff Ramses Vivas ("Vivas" or "Plaintiff") participated in an employee benefit plan funded by a group insurance policy (the "Policy") that Defendant Hartford Life and Accident Insurance Company ("Hartford" or "Defendant") issued to his employer, Kendall Imports. (D.E. No. 77 at ¶ 1; D.E. No. 84 at ¶ 1). Plaintiff seeks to overturn Defendant's decision to discontinue payment of his long-term disability ("LTD") benefits, and moves for summary judgment on the basis that Defendant's decision to uphold termination of Plaintiff's LTD benefits was *de novo* wrong and manifestly unreasonable. Defendant asserts that the complete administrative record

(the "Administrative Record")[1] of Vivas's LTD claim establishes that its decision to discontinue benefits was not wrong, thus mandating the entry of summary judgment in Hartford's favor. For the reasons set forth below, this Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

## I. Relevant Factual and Procedural Background

This is an action to recover LTD benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et seq.* ("ERISA"). Plaintiff was employed as the director of information technology for Kendall Imports at all material times (D.E. No. 86 at ¶ 1), and he participated in an employee benefit plan funded by a group insurance policy that Hartford issued to his employer. (D.E. No. 77 at ¶ 1; D.E. No. 84 at ¶ 1). Plaintiff ceased working for Kendall Imports in February 2007. (D.E. No. 77 at ¶ 5; D.E. No. 86 at ¶ 15). Shortly thereafter, on March 9, 2007, he received a separation agreement confirming his release from employment. (AR at H555; D.E. No. 86 at ¶ 15). In February 2007, Plaintiff applied for short-term disability benefits ("STD") (D.E. No. 77 at ¶ 5), which Hartford initially denied. (AR at H382–83; D.E. No. 86 at ¶ 15). In connection with his STD claim, Plaintiff submitted a letter to Hartford on April 25, 2007, stating that he suffers from severe osteoporosis and is "unable to perform [his] job ... [because] the pain is constant." (AR at H343). Also on April 25, 2007, Plaintiff's physician, Jose J. Aldrich, M.D. ("Dr. Aldrich"), a rheumatologist, submitted a letter stating that he has treated Plaintiff for a "severe case of osteoporosis since August 2005"

and that his condition has worsened to the point that he recommends Plaintiff "stop working because of the possibility of bone fracture." (AR at H345; D.E. No. 86 at ¶ 16). Plaintiff appealed Hartford's denial of STD benefits (AR at H298–99; D.E. No. 86 at ¶ 17) and, on July 31, 2007, Hartford reversed its initial decision, finding Vivas totally disabled for the period of February 28, 2007 through the duration of his eligibility for STD benefits. (AR at H278). On August 2, 2007, Hartford confirmed that Plaintiff's STD benefits would last through September 4, 2007.

In August 2007, Vivas submitted a claim for LTD benefits. (AR at H213–16; D.E. No. 77 at ¶ 5; D.E. No. 84 at ¶ 5). In support of this claim, Dr. Aldrich submitted an Attending Physician's Statement of Disability, reflecting a primary diagnosis of severe osteoporosis, a secondary diagnosis of vertebral compression fracture, and subjective symptoms of back pain. (AR at H224–25). Dr. Aldrich indicated that Plaintiff would have unspecified lifelong limitations regarding certain physical activities (e.g., standing, walking, lifting/carrying; reaching/working overhead; pushing; pulling; driving; keyboard use/repetitive hand motion). *Id.* at H225. On September 11, 2007, Hartford approved Plaintiff's claim for LTD benefits, with benefits effective as of September 5, 2007. (AR at H198–201; D.E. No. 77 at ¶ 8; D.E. No. 84 at ¶ 8). Pursuant to the terms of the Policy, benefits were payable for the first 24 months while Plaintiff met the definition of "Disability" as related to his *own* occupation. (AR at H198). Thereafter, Plaintiff was only entitled to benefits if Hartford determined that he could not perform one or more of the essential duties of *any* occupation. (AR at H199; D.E. No. 86 at ¶ 20).

---

1. Citations to the Administrative Record are designated with "AR" followed by the stamped page number. The Administrative Record is contained at Docket Entry No. 78.

In a letter dated March 5, 2009, Hartford informed Vivas that, effective September 5, 2009, he "must be considered *totally disabled* ... in order to continue to be eligible for LTD benefits." (AR at H106) (emphasis added). Hartford also requested additional information from Plaintiff, advising him that they had initiated an investigation to determine whether he would qualify for benefits on and after September 5, 2009. *Id.* To obtain documentation of Plaintiff's functionality, an investigative firm conducted video surveillance of Vivas on January 15 and 16, 2009, at Hartford's request. (AR at H834–35; D.E. No. 77 at ¶ 10; D.E. No. 84 at ¶ 10). The video surveillance and Plaintiff's medical records were reviewed by David Knapp, M.D. ("Dr. Knapp"), a Board Certified physician in Internal Medicine with a Speciality Certificate in Rheumatology. (AR at H705–09). In a Peer Review Report, Dr. Knapp provided the following analysis of the video surveillance:

> A case summary for surveillance on 1/15/09 documents [Vivas] walking and lifting his dog into a vehicle and retrieving bags from the rear passenger section while bending at the waist. [Vivas] was noted to be able to participate in exercises at a fitness gym for approximately and [sic] hour. On 1/16/09 [Vivas] was noted to be able to drive and trim hedges in the garden as well as carry items in a basket while shopping. [Vivas] was noted to be able to dine in a restaurant without difficulty and drive himself. The surveillance on 1/15/09 documents that [Vivas] drove to the fitness gym, was observed walking on a treadmill and exercising with various weight machines. Again [Vivas] was noted to bend at the waist and place a basket on the ground as well as walk his dog. A picture of [Vivas] which appears unremarkable and a back brace is noted.

> Surveillance on 1/15/2009 reveals [Vivas] to function in a normal and unencumbered manner in the course of driving to a gym and using exercise equipment. He was noted to easily enter and exit his vehicle and was able to twist in order to secure the restraints and back up. He was noted to bend and lift a small piece of luggage and lift and pull a larger piece of luggage on wheels. The weight load on the equipment he used was significant and not light. On 1/16/2009 the claimant engaged in activities that included garden work and shopping. He used both hands without difficult [sic] to prune bushes and was able to carry a grocery basket in the right hand as well as use of a cell phone. He was able to stand and ambulate in a comfortable appearing manner and bent over without difficulty. He carried groceries in a bag without difficulty. [Vivas's] ambulation and gait patterns appeared unremarkable. [He] stood on line to purchase a beverage without obvious distress as well as walk his dog. He was able to sit without difficulty as well as reach behind over his shoulder. He was noted to bend over and stoop in the course of walking his dog.

(AR at H705–06; *see also* D.E. No. 33, Notice of Filing Surveillance Discs). Dr. Knapp further stated that:

> Based on all the information presented there are no restrictions and limitations supported based on all the information available for review.

> While the records do document a decrease in bone mineral density, no fracture of the spine or any other tissue pathology is documented that would be considered a medical impairment for which restrictions and limitations would be needed.

(AR at H708).

On July 20, 2009, Hartford completed its review of Plaintiff's claim for LTD bene-

fits, and determined that he would not be eligible for LTD benefits beyond July 20, 2009. (AR at H494–99). Hartford based its decision on a review of:

- Claimant Questionnaire completed on 08/23/07;
- The Attending Physician's Statement signed by Dr. Aldrich on 07/14/08;
- Medical records from Dr. Aldrich through 03/16/09;
- Written letter signed by [Plaintiff] and received by The Hartford on 05/21/07;
- Job Description for the position of Information Technologies Director from [Plaintiff's] Employer, received on, 09/10/07;
- Occupational Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on 09/11/07;
- Activity check conducted on 01/15/09 and 01/16/09;
- Interview conducted at [Plaintiff's] home by Hartford Representative Jose Martinez on 04/10/09;
- Review of [Plaintiff's] claim file by The Hartford's Medical Case Manager (MCM) on 05/27/09; and
- Independent Medical Record Review completed on 07/10/09

(AR at H496). Plaintiff appealed the benefits termination decision. (D.E. No. 77 at ¶ 22; D.E. No. 86 at ¶ 22). To assist in Hartford's consideration of Plaintiff's appeal, Vicki Kalen, M.D. ("Dr. Kalen"), a physician Board Certified in Orthopedic Surgery, reviewed Plaintiff's medical records. (AR at H669–70; D.E. No. 77 at ¶ 23). Dr. Kalen determined:

[Vivas] has been found to have osteoporosis on multiple bone scans. [Vivas's] T score values do put him in the category of osteoporosis and it seems that he has had a lumbar compression fracture even prior to 2005. However, [Vivas] was working up until 02/28/2007 and no objective data in the DEXA scans shows his state of osteoporosis to have worsened since 01/24/2007. In fact, the opposite is true and his T scores from 2008 are improved at –2.8 and –2.9. **[Vivas's] subjective complaints are inconsistent with his diagnosis of osteoporosis.** Osteoporosis does not cause the severe impairments claimed by [Vivas]. It doesn't lead to total body pain, inability to use the fingers, or numbness. **Therefore, the subjective complaints are not consistent with the objective diagnosis.** In addition, the video surveillance shows [Vivas] performing well in many tasks including exercising, bending, walking and lifting. No impairment is visible on these videos and they are not consistent with his reports of his functional abilities. Even Dr. Aldrich was surprised to see all of the activities that the claimant could obviously perform and perform without any signs of discomfort or impairment.

(AR at H671) (emphasis added). Dr. Kalen further found that:

[Vivas] is certainly capable of Sedentary level work and Dr. Aldrich is in agreement, I also find no reason that [Vivas] could not work full time at a light level as of 07/21/2009.

No restrictions or limitations beyond the definitions of the above work categories, with the exception of the opportunity to have a sit/stand option frequently (activity or condition exists from 1/3 to 2/3 of the time). [Vivas] should never lift more than 20 pounds.

*Id.* After reviewing Dr. Kalen's report, Defendant reversed the benefits termination decision on the basis that Plaintiff's own occupation was medium-level, and neither Dr. Kalen nor Dr. Aldrich deemed Plaintiff capable of medium-level work.

(AR at H525–26; D.E. No. 77 at ¶ 26; D.E. No. 84 at ¶ 26). Plaintiff's LTD benefits were, therefore, reinstated effective July 21, 2009. *Id.*

Subsequently, Defendant performed an Employability Analysis using the Occupational Access System program to identify a representative sample of two occupations, recognized by the United States Department of Labor's Dictionary of Occupational Titles ("DOT"), that were within the capabilities described by Dr. Kalen and also within the appropriate wage range. (AR at H652–53; D.E. No. 77 at ¶ 27). The results of the Employability Analysis identified three occupations within the closest match, including computer security specialist and reworker, printed circuit board. (AR at H653). Accordingly, on November 5, 2009, Defendant notified Plaintiff that he no longer met the Policy's definition of "Disability" that became applicable to his claim effective September 5, 2009 (i.e., "totally disabled"). (AR at H484). Defendant specified that, "Based on the response from Dr. Knapp and Dr. Kalen, as well as the investigative documentation obtained, the weight of the evidence in [Plaintiff's] file support[ed] that [he was] physically capable of performing full-time work with the opportunity to sit/stand frequently and never lift more than 20 pounds." (AR at H489). Ultimately, because Defendant concluded that Vivas was not prevented from performing the essential duties of *any* occupation, Hartford terminated his LTD benefits, and no benefits were payable beyond September 4, 2009. (AR at H490; D.E. No. 77 at 28). In a letter dated March 8, 2010, Plaintiff again appealed Hartford's decision. (AR at H569–70; D.E. No. 77 at ¶ 29; D.E. No. 86 at ¶ 23). In connection with his appeal, Plaintiff submitted a letter from Dr. Aldrich stating:

> Mr. Ramses Vivas is a patient with a diagnosis of osteoporosis and a compression fracture of the spine; he is under treatment with appropriate medications . . . and an exercise program to assure strengthening of the back musculature.

> The prognosis for his illness is good, but one must consider, as he has been informed, that a recurrence of fracture(s) could occur. He will continue treatment with follow up appointments, especially in view of the present day awareness that bisphosphonates may not fully reduce incidence of fractures on a long term basis.

> He has also being [sic] made aware of the importance of continuing with his exercise program and to follow an appropriate diet.

> This diagnosis and outlook on Mr. Vivas health may be modified as further developments occur.

(AR at H564).

On April 7, 2010, Hartford notified Plaintiff that it was upholding its decision to terminate his LTD benefits. (AR at H478–81; D.E. No. 77 at ¶ 31; D.E. No. 86 at ¶ 26). Defendant noted that Dr. Aldrich's letter "did not provide any evidence or suggestion of further worsening of [Plaintiff's] osteoporosis, and did not make any recommendations for additional functional limitations or restrictions." (AR at H480; D.E. No. 77 at ¶ 34). On February 8, 2011, Plaintiff received a notice of a favorable disability determination by the Social Security Administration ("SSA"), finding Vivas disabled as of February 25, 2007 "because [his] impairment or combination of impairments is so severe that [he] cannot perform any work existing in significant numbers in the national economy." (AR at H1284; D.E. No. 86 at ¶ 27).

Plaintiff filed suit against Defendant in state court, and the case was removed to this Court pursuant to 28 U.S.C. §§ 1331 and 1441. (D.E. No. 1). In his Second

Amended Complaint, Plaintiff alleges that he is entitled to unpaid LTD benefits, plus interest, as well as attorney's fees and costs from Defendant, for failure and refusal to pay the full amount of the loss as mandated under the Policy. (D.E. No. 12 at 2). During the pendency of this case, Defendant admitted that it did not consult with a medical professional in deciding its final appeal, thus failing to comply with 29 C.F.R. § 2560.503–1. (D.E. No. 26 at 19). Defendant further admitted that this constituted a procedural error in its claims review process. *Id.* Accordingly, this Court remanded the matter to Hartford for reconsideration of Plaintiff's claim for disability benefits, specifically to include a review by an independent medical professional. (D.E. No. 46 at 13). The Court specified, however, that it made no judgment regarding the merits of the disability claim itself in remanding Plaintiff's claim for a full and fair review. *Id.*

In October 2012, Dr. Siegel, Hartford's independent medical reviewer, was instructed to provide the recommendation he felt the overall documentation best supported. (AR at H1437; D.E. No. 86 at ¶ 29). Dr. Siegel issued a Medical Record Review of Ramses Vivas on December 6, 2012. (AR at H1262). In pertinent part, Dr. Siegel found Vivas's alleged physical restrictions and physical limitations "far overstated." *Id.* at 1273. Summarizing his overall findings, Dr. Siegel found that "Vivas should have been physical [sic] capable of performing regular, full-time, work duties without specific physical restrictions or physical limitations as of 9/5/09" based on the totality of the information reviewed. *Id.* at 1274. Pursuant to this Court's Order, Hartford's Appeal Unit reviewed Vivas's file separately from the individuals who made the original decision to terminate benefits, with no deference to that decision. (AR at H1250). In coming to its final decision that no benefits

were payable beyond September 4, 2009, Hartford considered the following information:

1. Letters from [Vivas], dated 10/2/2012, 10/25/2012 and 10/31/2012;

2. Notice of Decision—Fully Favorable from the Social Security Administration, dated 2/8/2011;

3. Comprehensive Rehabilitation Evaluation by Craig H. Lichtblau, MD [ ("Dr. Lichtblau") ], dated 10/3/2012, and addendum dated 10/30/2012;

4. Attending Physician Statement completed by Jose J. Aldrich, MD, dated 10/31/2012;

5. Medical records from Dr. Aldrich, covering the period 3/29/2010 through 10/29/2012;

6. Medical review by Jerome Siegel, MD, Board Certified in Internal Medicine and in Occupational Medicine, an independent physician consultant associated with University Disability Consortium (UDC), dated 12/6/2012.

(AR at H1250). Additionally, Hartford explicitly indicated that it considered the fact that Vivas was approved for Social Security Disability ("SSD") benefits, but noted that "it is possible to qualify for SSD, but no longer continue to qualify for private LTD benefits from [Hartford]." *Id.* at 1251. Hartford explained that while it considered the SSA's disability determination as one piece of relevant evidence, it is not conclusive because "[t]he standards governing receipt of these public and private benefits are different in critical ways." *Id.* Ultimately, Hartford found that the preponderance of the evidence established that as of September 5, 2009, Plaintiff had the functional capacity to perform the Essential Duties of Any Occupation as defined by the Policy. As such, he did not satisfy the definition of Disability applica-

ble to his claim effective September 5,2009. *Id.* at 1254.

Thereafter, this Court granted Plaintiff's Unopposed Motion to Reopen (D.E., No. 70) based on Defendant's final determination as to Plaintiff's claim. (D.E. No. 76). The Court reopened the matter in order to determine the propriety of Defendant's most recent denial decision. (D.E. No. 76 at 1). The parties thereafter filed their respective motions for summary judgment, which the Court considers herein.

## II. Relevant Terms of the Policy

The Policy expressly grants discretionary authority to Defendant in making benefits determinations. (AR[2] at H40; D.E. No. 77 at ¶ 1; D.E. No. 84 at ¶ 1). Pursuant to the terms of the Policy, LTD benefits are payable to covered employees who become disabled, as defined in the Policy, and remain so through the applicable elimination period. The employee is responsible for submitting satisfactory proof of disability to Defendant, which has the right to determine whether such proof is satisfactory. (AR at H31, 38–39; D.E. No. 77 at ¶ 2; D.E. No. 84 at ¶ 2).

The Policy provides that payment of LTD benefits will terminate when a claimant is no longer disabled or fails to furnish requested proof of continuing disability. (AR at H32; D.E. No. 77 at ¶ 3; D.E. No. 84 at ¶ 3). Further, the Policy contains the following applicable definition of the term "disabled":

[D]uring the Elimination Period and for the next 24 months you are prevented by:

1. accidental bodily injury;
2. sickness;
3. Mental Illness;
4. Substance Abuse; or

5. pregnancy,

from performing one or more of the Essential Duties of *Your Occupation* ....

After that, you must be so prevented from performing one or more of the Essential Duties of *Any Occupation* ....

**Essential Duty** means a duty that:

1. is substantial, not incidental;
2. is fundamental or inherent to the occupation; and
3. can not be reasonably omitted or changed.

(AR at H41, 42; D.E. No. 77 at ¶ 4; D.E. No. 86 at ¶ 2) (emphasis added). "Any Occupation" is defined as "an occupation for which you are qualified by education, training or experience, and that has an earning potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." (AR at H41). Additionally, the Policy sets forth procedures for processing appeals of benefit termination decisions. Specifically,

When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.

(AR at H70).

## III. Legal Standard, Motion for Summary Judgment

Pursuant to Fed.R.Civ.P. 56(a), "The court shall grant summary judgment if the

---

**2.** The AR comprises the basis for Defendant's decision to terminate Plaintiff's benefits.

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue *of material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. It is "material" if it might affect the outcome of the case under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In addition, when considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See U.S. v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.,* 941 F.2d 1428, 1438 (11th Cir.1991). The moving party " 'must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial.' " *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.' " *Four Parcels,* 941 F.2d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991)).

By contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. 2548 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the non-moving party's case." *Id.* at 324, 106 S.Ct. 2548. Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite "to particular parts of materials in the record" or show "that the materials cited do not establish the absence or presence of a genuine dispute." Fed.R.Civ.P. 56(c)(1).

## IV. Framework for Analyzing ERISA Claims

An ERISA benefit plan participant may bring a civil action to recover, enforce or clarify his rights to benefits under the terms of the plan. 28 U.S.C. § 1132(a)(1)(B). The "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard of review unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Hunt v. Hawthorne Assoc., Inc.,*

119 F.3d 888, 912 (11th Cir.1997). "ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries." *Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir.2004) (overruled on other grounds by *Doyle v. Liberty Life Assurance Co. of Boston,* 542 F.3d 1352, 1356 (11th Cir. 2008)). However, in applying the standard set forth in *Firestone,* "The Eleventh Circuit established a 'well-defined series of steps' for district courts to follow in 'reviewing a denial of benefits decision in an ERISA case.'" *Walker–Hall v. Am. Int'l Life Assurance Co.,* 788 F.Supp.2d 1355, 1357 (M.D.Fla.2011) (quoting *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir.2008)). The court's inquiry begins with a review of the "plan documents to determine whether they grant the administrator discretion in making the benefit determinations." [3] *Richey v. Hartford Life & Accident Ins. Co.,* 608 F.Supp.2d 1306, 1309 (M.D.Fla.2009). Next, the court performs the following six-step analysis in reviewing an administrator's benefits decision:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision;

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision;

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision

under the more deferential arbitrary and capricious standard);

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest; and

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply [the] arbitrary and capricious review to the decision to affirm or deny it.

*Williams,* 373 F.3d at 1138; *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195 (11th Cir.2010). The Supreme Court has questioned the sixth step of this analysis, *see Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), and the Eleventh Circuit recognizes that it does not require a "heightened" standard of review when a conflict of interest is present. *Doyle,* 542 F.3d at 1360. "[T]he existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Walker–Hall,* 788 F.Supp.2d at 1358 (quoting *Capone,* 592 F.3d at 1196); *Doyle,* 542 F.3d at 1360. Additionally, "'the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.'" *Walker–Hall,* 788 F.Supp.2d at 1358 (quoting *Doyle,* 542 F.3d at 1360). "Even where there is a conflict of interest, courts still 'owe deference' to the administrator's 'discretionary decisionmaking.'" *Richey,* 608 F.Supp.2d at 1310 (quoting *Doyle,* 542 F.3d at 1363).

Under this framework, Vivas initially bears the burden to prove that he is dis-

---

**3.** The parties have agreed that the Policy expressly grants discretionary authority to Defendant in making benefits determinations.

(AR at H40; D.E. No. 77 at ¶ 1; D.E. No. 84 at ¶ 1).

abled and that Hartford's decision is wrong. *See Glazer*, 524 F.3d at 1247. If Plaintiff meets his burden, then he must demonstrate that Hartford's decision to terminate his LTD benefits was arbitrary and capricious, meaning it had no reasonable grounds to support its decision. *Id.* at 1246. In considering whether Hartford's decision was arbitrary and capricious, the Court must take into account Hartford's conflict of interest in paying Plaintiff's claim, but its analysis remains centered on whether a reasonable basis existed for Hartford's decision. *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir.2011).

## V. Discussion

Under the terms of the Policy, Kendall Imports, Plaintiff's employer, is the named policyholder and Hartford is the named fiduciary. (AR at H1). As the fiduciary, and per the parties' stipulation, Hartford had full discretion and authority to determine Plaintiff's eligibility for benefits. (AR at H40; D.E. No. 77 at 1; D.E. No. 84 at 1). The Court must now consider whether the aggregate evidence, viewed in the light most favorable to Plaintiff, could support Hartford's decision under the def- erential ERISA standards set forth above. *See Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir.2002).

■ Plaintiff fails to introduce evidence that he was *totally disabled* when Hartford terminated his benefits and, therefore, the Court does not find a genuine issue of material fact as to whether Hartford's decision was wrong. As of September 5, 2009, Plaintiff no longer met the Policy's definition of "Disability" as it became applicable to his claim effective September 5, 2009. Namely, Plaintiff failed to show that he was prevented from performing one or more of the essential duties of *any occupation*. Three Board Certified reviewing physicians—Dr. Knapp,[4] Dr. Kalen[5] and Dr. Siegel,[6]—all independently determined that Plaintiff was capable of performing sedentary work. Plaintiff has failed to demonstrate that Hartford's reliance on the doctors' review of the materials and subsequent opinions was wrong or unreasonable, *See Giertz–Richardson v. Hartford Life and Acc. Ins. Co.*, 536 F.Supp.2d 1280, 1291 (M.D.Fla.2008) (summary judgment for administrator upheld where "the opinions of the independent reviewing physicians all supported Defendant's decision

---

**4.** In a 2009 Peer Review Report, Dr. Knapp noted,

> Based on all the information presented there are no restrictions and limitations supported based on all the information available for review.... While the records do document a decreased bone mineral density, no fracture of the spine or other tissue pathology is documented that would be considered a medical impairment for which restrictions and limitations would be needed.

(AR at H708).

**5.** Dr. Kalen submitted an independent review of Vivas' LTD benefits appeal on October 22, 2009, indicating, in pertinent part, that Dr. Aldrich, Plaintiff's physician, "felt [Plaintiff] could work per the DOT at the Sedentary level." (AR at H670). Additionally, Dr. Ka- len submitted that "[Vivas] is certainly capable of Sedentary level work and Dr. Aldrich is in agreement.... [Finding] no reason that [Vivas] could not work full time at a light level as of 07/21/2009." *Id.* at 671. The only limitations Dr. Kalen indicated as applying to Plaintiff included "the opportunity to have a sit/stand option frequently (activity or condition exists from 1/3 to 2/3 of the time) ... [Also, Vivas] should never lift more than 20 pounds." *Id.*

**6.** Dr. Siegel submitted a Medical Record Review of Ramses Vivas on his December 6, 2012. (AR at H1262–75), Therein, he opined as follows, "I am unable to substantiate the need for any physical restrictions or physical limitations as of 9/5/09 forward, based on the totality of the information reviewed." *Id.* at H1275.

to terminate Plaintiff's benefits."). Even assuming *arguendo* that Hartford's decision was wrong, Defendant nonetheless provides reasonable grounds to support its discontinuation of Plaintiff's LTD benefits, satisfying the third step in this analysis. The Court is now left to determine whether Hartford operated under a conflict of interest (Step 4) and, if so, it must review the decision under an arbitrary and capricious standard (Step 6).

### A. Plaintiff's Arguments

#### 1. Dr. Aldrich consistently found Vivas incapable of working.

Plaintiff's argument that Dr. Aldrich, Vivas's treating physician, found Vivas incapable of working as a result of suffering from severe osteoporosis and a prior lumbar fracture does not make Hartford's final decision to terminate LTD benefits wrong. Hartford "need not accord extra respect to the opinions of a claimant's treating physicians," *Blankenship*, 644 F.3d at 1354, and this Court cannot say that Hartford was wrong to credit the opinions of the reviewing physicians over that of Dr. Aldrich. *See Giertz–Richardson*, 536 F.Supp.2d at 1291 ("While Plaintiff's doctors believe that Plaintiff was unable to work, it was not wrong for Defendant to credit the opinions of the [ ] doctors that reviewed Plaintiff's medical records over the opinions of Plaintiff's [sic] doctors.") (citing *Helms v. General Dynamics Corp.*, 222 Fed.Appx. 821, 833 (11th Cir.2007)). Furthermore, in his 2009 discussions with Dr. Kalen after viewing the video surveillance, Dr. Aldrich noted that Vivas was doing more than he said he was able to do. (AR at H670). Specifically, Dr. Aldrich indicated that Vivas could work per the DOT at the Sedentary level. *Id.* As Defendant points out in its reply in support of its motion for summary judgment, despite numerous opportunities, Dr. Aldrich has never disputed Dr. Kalen's account of his recommendation. (D.E., No. 91 at 4). The only conflicting account came two years later, on October 31, 2012, when Dr. Aldrich filled out a checklist and indicated "yes" to the question, "Based on your treatment of [Vivas], in your medical opinion, has [he] been *UNABLE* to perform all the essential duties of any occupation, since you started to treat him and continuously through the present time?" (AR at H1401).

#### 2. Dr. Lichtblau's Assessment Provided Hartford with Additional Objective Evidence of Vivas's Functionality.

Additionally, Plaintiff argues that Dr. Lichtblau's medical opinion provided Hartford with additional objective evidence of Vivas's functionality which should have been considered before Defendant made its final decision. (D.E. No. 83 at 5). Specifically, Dr. Lichtblau opined that Vivas " 'd[id] not have the functional capacity to work 4 hours per day *at this time*' among a number of other functional limitations." *Id.* (quoting AR at H1423) (emphasis added). However, Dr. Lichtblau examined Vivas for the first time on October 3, 2012 and, therefore, "at this time" clearly referred to October 2012. (AR at H1420). Accordingly, Dr. Lichtblau's medical examination sheds no light on Vivas's functionality during the relevant time period in 2009 when Hartford discontinued his LTD benefits. *See Warming v. Hartford Life & Acc. Ins. Co.*, 663 F.Supp.2d 10, 20 (D.Me. 2009) (finding that administrator was not required to base its decision on testing that addressed the plaintiff's condition as of the date of testing conducted in 2008, rather than her condition as of the relevant time when her benefits were terminated in 2006). Dr. Lichtblau later sent a letter to Plaintiff's counsel clarifying that he had meant to include the following language in his report: "[Vivas] would not

have been able to perform his occupational duties and/or any occupation at the time that he was denied benefits." (AR at H1400). However, without indicating that he knew *when* Vivas's benefits were terminated, this addendum is of no use as he still does not specify the relevant time frame, much less the year (i.e., 2009), at issue herein.

3. **Hartford's medical reviewers inappropriately based most of their opinions on the surveillance video footage as opposed to the objective medical evidence.**

As further evidence of a "wrong" and manifestly "unreasonable" decision, Plaintiff characterizes Hartford's medical reviewers' reliance on the surveillance footage as inappropriate. (D.E. No. 83 at 9). In the face of "mounting objective evidence establishing Vivas's disability[,]" Plaintiff argues that Defendant cannot *solely* rely on the surveillance footage. *Id.* at 10. However, Hartford specifically indicated that it based its final determination to discontinue Plaintiff's LTD benefits on policy language, and all of the papers contained in his file were reviewed as a whole, including the following:

- Claimant Questionnaire completed on 08/23/07;
- The Attending Physician's Statement signed by Dr. Aldrich on 07/14/08;
- Medical records from Dr. Aldrich through 03/16/09;
- Written letter signed by [Plaintiff] and received by The Hartford on 05/21/07;
- Job Description for the position of Information Technologies Director from [Plaintiff's] Employer, received on, 09/10/07;
- Occupational Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on 09/11/07;

- Activity check conducted on 01/15/09 and 01/16/09;
- Interview conducted at [Plaintiff's] home by Hartford Representative Jose Martinez on 04/10/09;
- Review of [Plaintiff's] claim file by The Hartford's Medical Case Manager (MCM) on 05/27/09; and
- Independent Medical Record Review completed on 07/10/09

(AR at H496). Furthermore, in his Statement of Continued Disability dated April 10, 2009, Vivas even submitted that some of the activities depicted in the surveillance video were "more than what [he] told Hartford that [he] can do, but [he] was able to do them on those days because [he] ha[d] good and bad days." (AR at H773). Accordingly, Plaintiff's argument that Defendant improperly relied *solely* on the surveillance footage is unpersuasive, as the facts indicate a much more thorough and inclusive review of Plaintiff's claim.

4. **Hartford should have considered the favorable disability determination by the SSA granting Vivas coverage.**

On February 8, 2011, the SSA decided that Plaintiff was disabled as of February 25, 2007, (AR at H1284). Plaintiff argues that Hartford unreasonably disregarded this decision, and points out that " 'A determination of disability by SSA may be considered in reviewing a plan administrator's determination of benefits . . . ,' " (D.E. No. 83 at 14) (internal citations omitted). Defendant replies that Vivas's SSA award does not, per se, entitle him to LTD benefits under the Policy. (D.E. No. 91 at 8). Furthermore, the Administrative Record establishes that Hartford *did* consider the fact that Vivas was approved for SSD benefits. (AR at H1251). In its December 12, 2012 correspondence denying Plaintiff's appeal as to the termination of LTD bene-

fits, Hartford explicitly indicated that it had "considered the fact that Mr. Vivas was approved for [SSD] benefits[ ]" and explained how "it is possible to qualify for SSD, but no longer continue to qualify for private LTD benefits from ... Hartford." *Id.* Where "the standards governing receipt of these public and private benefits are different in critical ways[,]" the disparate outcomes are not unreasonable. *Id.* Because SSA determinations "are not persuasive in ERISA benefits cases[,]" this Court cannot find Hartford's decision to terminate Vivas's LTD benefits unreasonable based on the SSA's favorable finding of disability under *its* requirements. *Richard v. Hartford Life and Acc. Ins. Co.*, 356 F.Supp.2d 1278, 1289 (S.D.Fla. 2004), *aff'd* 153 Fed.Appx. 694 (11th Cir. 2005).

**5. Defendant's conflict of interest caused it to be financially biased in rendering an arbitrary and capricious decision.**

▮ Plaintiff argues, even assuming arguendo that "reasonable" grounds existed to support Hartford's decision, it is evident from the Administrative Record that Defendant's conflict of interest caused it to be financially biased in rendering an arbitrary and capricious decision. (D.E., No. 83 at 15). In response, Defendant submits that the district court's basic analysis under arbitrary and capricious review centers on " 'whether a reasonable basis existed for the administrator's benefits decision.' " (D.E. No. 91 at 9) (quoting *Blankenship,* 644 F.3d at 1355). Additionally, Defendant disputes Plaintiffs submission that Hartford has had a history of biased claims administration. *Id.* at 10.

A conflict of interest may arise where a party is responsible for both determining eligibility and paying benefits. *See Doyle,* 542 F.3d at 1359; *Williams,* 373 F.3d at 1136. In this case, the Policy itself gave Hartford full discretion and authority to determine eligibility and interpret the policy provisions. Hartford was also responsible for paying benefits to Kendall Imports' employees. Under these facts, a structural conflict of interest existed between Hartford's fiduciary and profit-making interests, since Hartford was responsible not only for determining eligibility, but also for paying benefits.

▮ Notwithstanding, the existence of a conflict of interest is not dispositive; rather, a conflict is simply one factor to be considered. *See Firestone,* 489 U.S. at 115, 109 S.Ct. 948. Further, the conflict of interest is to be evaluated on a case-specific basis, and not under a heightened standard of review. *Glenn,* 554 U.S. at 116–17, 128 S.Ct. 2343; *Miller v. Prudential Ins. Co. of Am.,* 625 F.Supp.2d 1256, 1262 (S.D.Fla.2008). Additionally, "Where a conflict exists and a court must reach step six, 'the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.' " *Blankenship,* 644 F.3d at 1355 (quoting *Doyle,* 542 F.3d at 1360). This Court must, therefore, determine whether the conflict of interest tainted Hartford's decision to terminate Plaintiff's LTD benefits. *See Miller,* 625 F.Supp.2d at 1266. In considering the weight of this factor, a court may give the conflict of interest low importance when the Administrative Record lacks evidence of "malice, self dealing, a parsimonious claims granting history, or other circumstances suggesting a higher likelihood that the structural conflict affected the benefits decision." *Id.*

Based on a thorough review of the Administrative Record, this Court finds no evidence to suggest that the structural conflict of interest affected Hartford's decision to terminate Plaintiff's LTD benefits. Indeed, there are reasonable grounds

to support Defendant's decision, as previously discussed herein. Although Plaintiff argues that Hartford did not take steps to reduce its financial bias (D.E. No, 83 at 17), the only cited support for this argument comes from (1) the existence of procedural irregularities including Defendant's failure to seek independent medical review, thereby violating 29 C.F.R. § 2560.503–1; (2) Defendant's failure to fully consider the SSA's favorable determination; (3) Defendant's reliance on favorable reports, while deemphasizing other reports supporting a contrary conclusion; and (4) Defendant's alleged failure to provide its medical reviewers with all relevant evidence. *Id.* at 19–20. By remanding the case to Hartford for a full and fair review of the record on appeal, specifically to include a review by an independent medical professional, this Court has already addressed Plaintiff's first argument. (D.E. No. 46). The Court further finds Plaintiff's argument regarding SSA's favorable determination unpersuasive given that the standards governing receipt of these public and private benefits are different in critical ways. Finally, based on a review of the Administrative Record, it is evident that all reviewing physicians conducted a thorough evaluation of Plaintiff's claim, fully investigating his disability, before terminating his LTD benefits, and then again upon appeal. *See Keith v. Prudential Ins. Co. of Am.,* 347 Fed.Appx. 548, 552 (11th Cir.2009) (noting that a claim administrator "thoroughly investigated [a] claim" where it considered the evidence and "obtained the opinions of three different medical professionals"). Because the Administrative Record lacks evidence of "malice, self dealing, a parsimonious claims granting history, or other circumstances suggesting a higher likelihood that the structural conflict affected the benefits decision[,]" this Court finds the present conflict of interest of low importance in considering the weight of this factor. *Miller,* 625 F.Supp.2d at 1266. Ultimately, the evidence shows that Hartford thoroughly investigated the claim and was not influenced by the conflict.

## VI. Conclusion

The Administrative Record establishes reasonable grounds for Hartford's interpretation and application of the Policy. Further, this Court finds no evidence to support Plaintiff's argument that the conflict of interest in any way affected Hartford's decision to terminate Plaintiff's LTD benefits. Accordingly, it is hereby

ORDERED AND ADJUDGED that:

1. Defendant's Motion for Summary Judgment (D.E. No. 77) is **GRANTED.**
2. Plaintiff's Motion for Summary Judgment (D.E. No. 85) is **DENIED.**
3. Final judgment shall be entered by separate order.
4. This case is **CLOSED,** and all pending motions are **DENIED AS MOOT.**